# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| BROCADE COMMUNICATIONS SYSTEMS LLC AND AVAGO TECHNOLOGIES INTERNATIONAL SALES PTE. LIMITED,<br><br>Plaintiffs,<br><br>v.<br><br>THE SALEM GROUP, INC. AND DAVID ROSENBLATT,<br><br>Defendants. | Civil Action No.: 1:21-cv-0382<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Brocade Communications Systems LLC and its affiliate Avago Technologies International Sales Pte. Limited ("ATIS") (collectively "Brocade" or "Plaintiff") file this Complaint against Defendants The Salem Group, Inc. ("Salem Group") and David Rosenblatt, and in support state and allege as follows:

## INTRODUCTION

1. Brocade manufactures and sells fibre channel storage area networking computer switches ("switches"), which are hardware devices that facilitate communication between servers and provide access to shared storage for multiple devices. Switches have varying numbers of "ports," which are access points for individual devices, and come pre-configured with a certain number of ports, such as 8, 16 or 24. To activate additional ports on a Brocade switch, end-users must purchase an appropriate license in the form of a license key. Similarly, certain advanced features on Brocade switches, such as trunking and monitoring, are also gated by license keys.

2. Defendants have been involved in an international counterfeiting scheme to generate counterfeit Brocade license keys and sell them to third-parties. As part of this scheme, Defendants have stolen property from Brocade and are responsible for at least $234,000 in direct, documented counterfeiting transactions. On information and belief, these activities have caused Brocade to suffer millions of dollars in lost sales and reputational harm.

## PARTIES

3. Plaintiff Brocade Communications Systems LLC is a Delaware limited liability company with a principal place of business at 1320 Ridder Park Dr., San Jose, California 95131, and has operations in North Carolina.

4. Plaintiff ATIS is a Singapore-based company with a principal place of business at 1 Yishun Avenue 7, Singapore 768923.

5. Both Plaintiffs are indirect wholly owned subsidiaries of Broadcom Inc., the global supplier of semiconductor and infrastructure software products. Brocade was the first owner of the intellectual property in Brocade's products at issue in this action, and assigned such intellectual property to ATIS after Broadcom's acquisition of Brocade in 2018, while retaining the right vis a vis ATIS to be co-plaintiff in intellectual property enforcement actions.

6. Defendant Salem Group, Inc. is a North Carolina corporation with a principal place of business at 209 Mercantile Drive, Winston-Salem, NC 27105. Salem Group is a used equipment broker that sells enterprise hardware to and from end-users and trading partners globally.

7. On information and belief, Defendant David Rosenblatt is a North Carolina resident. On information and belief, Rosenblatt resides at 94 Beechwood Dr., Lewisville, NC 27023. Rosenblatt has worked on Salem Group's sales staff since 1986 as a Vice President / Partner / Connectivity Specialist.

## JURISDICTION AND VENUE

8. This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the "laws . . . of the United States," specifically, 17 U.S.C. § 101, *et seq.* and 15 U.S.C. §§ 1114, 1116, 1117, and 1125. Supplemental jurisdiction exists over any remaining claims because all claims alleged herein arise from the same nexus of facts and form part of the same controversy.

9. This Court also has original jurisdiction over each claim pursuant to 28 U.S.C. § 1332(a)(1) because there is complete diversity of citizenship between the parties and the matter in controversy exceeds the sum of $75,000, exclusive of interests and costs.

10. This Court has personal jurisdiction over Defendants because they are all residents of the State of North Carolina.

11. Venue is proper within this Court pursuant to 28 U.S.C. § 1391(b)(1) because Defendants are all residents of this judicial district.

## FACTS

### Brocade's Switches and License Keys

12. Brocade is a global technology company headquartered in San Jose, California. As part of its business, Brocade designs and manufactures switches, which are

devices that facilitate communications between servers and provide access to shared storage for multiple devices. Switches have multiple ports, as seen below:



13. When first purchased, a switch has only certain ports activated. When an end-user wants to activate additional ports on a switch, they must purchase a port-on-demand license ("POD license"). The POD license contains a transaction key, and that transaction key allows the end-user to obtain the license key that activates additional ports from the Broadcom License Portal. License keys for advanced features on the switch work the same way.

14. License keys are unique to each switch. Once a license key has been applied to a particular switch it may never be applied to another switch. Licenses are not re-usable, transferrable or re-sellable.

### The Legitimate Market for Licenses

15. Licenses are sold through authorized channels at prices ranging from $3,350 to over $100,000.

16. The vast majority of Brocade's switches and POD licenses are sold through original equipment manufacturers ("OEMs").

17. When an end-user purchases a license through the legitimate market, they typically use the following process: (1) the end-user purchases a license, which contains a transaction key, from Brocade or an authorized reseller; (2) the end-user visits the Broadcom License Portal and enters the transaction key and the serial number of WWN ("World Wide Name") for their switch; (3) the Broadcom License Portal generates a unique license key for that switch; (4) the end-user downloads the license key and enters it into their switch's operating system; and (5) the license key turns on the functionality for additional ports on that switch.

18. The Broadcom License Portal provides self-help for legitimate end-users, resellers and service providers of Brocade, who must have an account to access the License Portal and must abide by applicable terms and conditions.

19. It is critical that end-users purchase licenses through the legitimate market. Applying counterfeit licenses may interfere with the proper operation of the switch, may cause support problems for the customer and may prevent the end-user from obtaining critical security updates and patches for the switch. Brocade switches are deployed in mission-critical data center settings, providing connectivity for some of the most important workloads for government agencies, law enforcement, all major branches of the military, and large enterprise customers, such as banks, hospitals, utilities and telecommunications providers. When such customers are unable to obtain critical security or maintenance updates for their switches, that presents a risk that critical computer infrastructure may suffer downtime.

## Counterfeit Licenses and License Keys

20. Recently, Brocade became aware of a burgeoning market for counterfeit licenses. Unlike legitimate licenses, counterfeit licenses provide only the license key, and are sent directly to the purchaser to enter into their switch. There is no transaction key involved, and the purchaser does not use the Broadcom License Portal to obtain the license key.

21. Counterfeit licenses and license keys sell for as little as $500—potentially tens of thousands of dollars less than the price of legitimate licenses.

22. The difference between the process for obtaining a legitimate versus counterfeit license key may be summarized as follows:

| Legitimate Transaction | Counterfeit Transaction |
|---|---|
| 1. Customer purchases transaction key from Broadcom or an authorized reseller.<br>2. Customer enters transaction key on Broadcom's License Portal.<br>3. Broadcom software generates a license key.<br>4. Customer receives license key and applies the code to the switch. This turns on the functionality of additional switch ports. | 1. Bad actor generates a counterfeit license key.<br>2. Bad actor sends counterfeit license key directly to the customer.<br>3. Customer enters counterfeit license key directly onto the switch, bypassing the Broadcom License Portal.<br>4. The counterfeit license key turns on the functionality of additional switch ports, but Broadcom's License Portal records are not updated.<br>5. The customer will be unable to update the switch or apply additional, legitimate POD licenses. |

23. Brocade's legitimate licenses are branded with Brocade's name and "wings" logo.

24. Counterfeit licenses, including those ultimately sold to end-users, are also often branded with Brocade's name and "wings" logo, or images substantially similar to that "wings" logo.

25. Brocade's name and "wings" logo are registered trademarks.

- 6 -

Case 1:21-cv-00382-CCE-JEP   Document 1   Filed 05/14/21   Page 6 of 19

26. Brocade has never consented to have its trademarks appear on counterfeit licenses.

## Brocade's Fabric OS Upgrades

27. Brocade's switches run using the Brocade Fabric Operating System ("FOS").

28. End-users may download upgrades for their FOS by purchasing a support contract, which grants the end-user access to Brocade's Customer Support Portal.

29. Before downloading FOS, an end-user must agree to a License Agreement ("EULA"), which restricts the end-user from installing FOS on more switches than the end-user was entitled or licensed to use:

> **Single User License.** Subject to the terms and conditions of this Agreement and payment of the applicable license fees, Brocade Communications Systems LLC ("Brocade") and its suppliers grant to you ("End User") a non-exclusive, non-transferable, non-sub licensable license to use the Software in object code form solely for the purpose of operating Brocade storage area networking switches and solely on the number of Brocade storage area networking switches for which End User is licensed to use this Software. End User may make such backup copies of the Software as may be necessary for End User's lawful use, provided End User affixes to such copies all trademark, copyright, patent, and notices of other proprietary rights that appear on the original.
>
> . . .
>
> **Restrictions.** Except as otherwise expressly provided in this Agreement, End User shall have no right, and End User specifically agrees not to, and not to permit third parties to: (i) modify, adapt, or create derivative works based upon the Software; (ii) copy, in whole or in part; (iii) decompile, translate, reverse engineer, disassemble or otherwise reduce the Software to human-readable form; (iv) use the Software on any Brocade storage area networking switches in excess of the maximum number of Brocade storage area networking switches for which End User is licensed; (v) install the Software on any Brocade storage area networking switches that have reached End of Support as defined by Brocade, (vi) use the Software on any devices not designated by Brocade for use with the Software (as notified through

software release notes and other notices), (vii) use, download, or make available for use or download, any versions of the Software that have reached End of Support, as declared by Brocade, or (viii) sub-license or permit third parties to post or otherwise make available, or use the Software to provide support for Brocade products without Brocade's express written consent.

. . .

**Upgrades and Additional Copies.** For purposes of this Agreement, "Software" shall also include any upgrades, updates, bug fixes or modified versions ("Upgrades") provided to End User by Brocade or an authorized distributor and for which End User had paid the applicable license fees, and any backup copies of the Software. Notwithstanding the foregoing, End User acknowledges and agrees that Brocade and its resellers and distributors shall have no obligation to provide any Upgrades. If Upgrades or additional copies of the Software are provided, End User acknowledges and agrees that it has no license or right to use such additional copies, POSTING, DISTRIBUTING OR OTHERWISE MAKING AVAILABLE or Upgrades unless End User, at the time of acquiring such copy or Upgrade, already holds a valid license and the corresponding software keys to the original Software for the applicable number of copies.

### Brocade's Discovery of an International Counterfeiting Scheme

30. In 2018, Brocade received notice of a support case from one of its OEMs for an end-user who had purchased secondhand switches. The end-user had received an "invalid license key" error, preventing it from installing a software upgrade. Brocade discovered that multiple license keys on each switch were counterfeit. Brocade also learned that the switches had been sold by the OEM to Inventus Group A/S ("Inventus"), a used equipment broker (like Defendant Salem Group) based out of Denmark. Brocade later learned that in recent years, Defendants have supplied Inventus with counterfeit license keys.

- 8 -

31. In February 2019, Brocade was notified that another end-user was having trouble applying a legitimate license key to one of its switches. On review, Brocade discovered counterfeit license keys on several of the end-user's switches.

32. Later, and in connection with the February 2019 incident, Brocade received information revealing that one of the main sources for counterfeit Brocade products has been Salem Group and Rosenblatt.

### Defendants' Role in the International Counterfeiting Scheme

33. Defendants have engaged in numerous transactions involving counterfeit license keys and misappropriated Brocade products in recent years.

34. There are two prongs to the scheme. First, Rosenblatt obtained counterfeit license keys from other bad actors in the international counterfeiting scheme. Those actors would obtain counterfeit license keys by deploying a "portal-query method," which used the Broadcom License Portal to identify the correct license keys to generate as counterfeits.

35. For example, Brocade has come to learn that in 2018, Rosenblatt sold four counterfeit license keys to Inventus using his official Salem Group work email.

36. Second, Defendants downloaded multiple copies of FOS upgrades and associated documentation without authorization and in violation of Brocade's EULA.

37. Brocade has recently learned that between 2010 and July 2020, Salem Group downloaded at least 217 copies of FOS, despite having purchased less than 10 support contracts (thus entitling Salem Group to less than 10 copies of FOS). In fact, Salem Group had no active support contracts between December 2012 and December 2018, but

nevertheless downloaded at least 97 copies of the FOS during that time, along with associated documentation.

38. Rosenblatt would then sell the counterfeit license keys to third parties. Sometimes, Rosenblatt would offer to bundle FOS with the sale of counterfeit license keys, *i.e.* selling illegally downloaded copies of FOS to unentitled parties.

39. For example, on one occasion Rosenblatt agreed to sell four counterfeit licenses to Inventus for $500 apiece, and in that same transaction agreed to send misappropriated copies of FOS. On information and belief, Rosenblatt completed this transaction using his Salem Group work email address.

40. In sum, Brocade has evidence that Rosenblatt completed transactions for at least 47 counterfeit license keys with Inventus for a variety of 8-port, 12-port and 24-port counterfeit license keys, plus counterfeit license keys for advanced switch features. On information and belief, these 47 counterfeit license keys reflect only a small fraction of the total number of transactions that Rosenblatt completed for counterfeit license keys (and misappropriated FOS), and Inventus is just one of Defendants' numerous customers for counterfeit license keys.

41. On information and belief, Rosenblatt committed the wrongful conduct alleged herein within the course and scope of his employment with Salem Group and in furtherance of Salem Group's business, and much of the wrongful conduct occurred within the work-related limits of time and place.

42. On information and belief, the procurement and sale of license keys and the FOS are activities that fall within the scope of Rosenblatt's employment at Salem Group

and is a means to accomplish what they were employed to do. Moreover, Rosenblatt frequently uses his Salem Group email address when selling counterfeit license keys (and misappropriated copies of FOS).

43. On information and belief, Salem Group has the right and ability to supervise and control the details of the work performed by Rosenblatt. And given the nature of Rosenblatt's employment, his wrongful conduct was foreseeable and predictable to Salem Group.

44. On information and belief, all billing and payments for the counterfeit licenses and license keys were processed through Salem Group, and Salem Group benefitted directly from the sale of the counterfeit products.

45. On information and belief, Defendants' roles in the international counterfeiting scheme remain ongoing today.

46. Overall, Defendants' verified counterfeiting activities have caused Brocade to lose at least $234,000 of revenue.

47. On information and belief, the true scale of Defendants' operation is surely much larger, and may have cost Brocade millions of dollars in potential revenue in recent years, along with additional damages in the form of loss of goodwill and reputational harm.

### COUNT I

**CONTRIBUTORY TRADEMARK INFRINGEMENT
15 U.S.C. §§ 1114, 1116, 1117, 1125
(Against All Defendants)**

48. The allegations in Paragraph 1–47 are re-alleged as if set forth fully herein.

49. Brocade and ATIS are the sole owners of the Brocade "wings" logo, and of the corresponding trademarks.

50. Brocade has been using its "wings" logo registered trademark continuously in commerce since at least 2008. Brocade has invested substantial time, effort and financial resources promoting these marks in connection with the marketing and sales of its goods and services in interstate commerce, and the consuming public recognizes and associates these trademarks with Brocade.

51. On information and belief, Defendants have contributed to the infringement of Brocade's trademarks by distributing counterfeit license keys without approval or authorization from Brocade to used equipment brokers, such as Inventus, that are placing those counterfeit license keys on counterfeit POD license certificates bearing copies of the trademarked "wings" logo.

52. On information and belief, Defendants knew or had reason to know that the counterfeit license keys they sold to third parties, such as Inventus, would be used to generate counterfeit license certificates, and that those counterfeit license certificates bore the trademarked "wings" logo.

53. On information and belief, Defendants are continuing to distribute counterfeit license keys to third parties—whom Brocade reserves the right to move to amend this pleading to add as parties to this case, subject to identifying the same during pretrial discovery proceedings—knowing or having reason to know that those third parties are engaging in direct trademark infringement of the "wings" logo, and/or have induced others to infringe the "wings" logo.

54. On information and belief, Defendant have failed to take reasonable precautions against the infringing conduct of others.

55. At minimum, Defendants acted with willful blindness to, or in reckless disregard of, Brocade's registered trademarks.

56. On information and belief, Defendants have committed, and on information and belief continue to commit, acts contributing to the infringement of Brocade's trademarks.

57. As a direct and proximate result of Defendants' wrongful conduct, Brocade has suffered and will continue to suffer monetary loss, and is entitled to recover treble damages, actual damages and Defendants' profits attributable to the infringement, in an amount to be determined at trial. 15 U.S.C. § 1117.

58. In the alternative, Brocade is entitled to statutory damages pursuant to 15 U.S.C. § 1117(c).

59. Brocade is also entitled to recover its attorneys' fees and costs pursuant to 15 U.S.C. § 1117(a).

60. As explained in paragraphs 41 through 43, even if not directly liable for the misconduct, Salem Group is vicariously liable for Rosenblatt's misconduct.

## COUNT II

**BREACH OF CONTRACT**
**(Against Defendant Salem Group)**

61. The allegations in Paragraph 1–60 are re-alleged as if set forth fully herein.

62. The EULA between Brocade and Salem Group is a valid and binding contract supported by valuable consideration.

63. The EULA was entered into by Brocade and Salem Group.

64. The EULA states that Salem Group's use of FOS is limited to "operating Brocade storage area networking switches and solely on the number of Brocade storage area networking switches for which [Salem Group] is licensed to use [FOS]."

65. The EULA also states that Salem Group may not permit third parties to: (1) "use the [FOS] on any Brocade storage area networking switches in excess of the maximum number of Brocade storage area networking switches for which [Salem Group] is licensed"; (2) "install [FOS] on any Brocade storage area networking switches that have reached End of Support as defined by Brocade"; or (3) use [FOS] on any devices not designated by Brocade for use with [FOS]."

66. The EULA also states that if a FOS upgrade is provided, Salem Group "acknowledges and agrees that it has no license or right to use such copies, POSTING, DISTRIBUTING OR OTHERWISE MAKING AVAILABLE [those] Upgrades unless [Salem Group] . . . already holds a valid license and the corresponding software keys to the original [FOS] for the applicable number of copies."

67. Salem Group's copying of more than 200 copies of FOS (including at times during which Salem Group did not hold a valid support contract) and distributing FOS to third parties (the vast majority of whom, on information and belief, did not have support contracts with Brocade) constitute material breaches of Salem Group's contractual obligations under the EULA.

- 14 -

Case 1:21-cv-00382-CCE-JEP   Document 1   Filed 05/14/21   Page 14 of 19

68. On information and belief, Salem Group has carried out this breach deliberately and with full knowledge of its obligations under the EULA.

69. Brocade has performed all of the terms and conditions required of it under the EULA, including but not limited to, providing Salem Group with access to Brocade's support portal and making FOS available to Salem Group for use on Salem Group's own licensed switches.

70. As a direct and proximate result of Salem Group's material breaches of the EULA, Brocade has suffered damages that continue to accrue, in an amount to be determined at trial.

### COUNT III

**UNFAIR TRADE PRACTICES**
**N.C.G.S.A. § 75-1.1(a)**
**(Against All Defendants)**

71. The allegations in Paragraphs 1–70 are re-alleged as if set forth fully herein.

72. Defendants' acts, set forth above, constitute unfair trade practices under North Carolina law. Defendants' actions offend established public policy and are unethical, deceptive and unscrupulous.

73. Defendants' acts were in or affected commerce because their acts were business activities conducted within and outside of North Carolina.

74. Defendants' unlawful acts have allowed, and will continue to allow, Defendants to receive profits to which they are not entitled.

75. As a direct and proximate cause of Defendants' unlawful acts, Brocade has sustained substantial injury, including but not limited to lost revenues, confusion of

- 15 -

Case 1:21-cv-00382-CCE-JEP   Document 1   Filed 05/14/21   Page 15 of 19

potential customers and reputational harm.  Unless restrained, Defendants will continue to damage Brocade, including causing irreparable reputational harm.

76. Defendants' unlawful acts, as set forth above, have directly and proximately caused Brocade to suffer monetary damage in an amount to be determined at trial.  Brocade further seeks restitution of all economic gains realized by Defendants as a result of their unfair trade practices.

77. Brocade also seeks treble damages, attorneys' fees and costs pursuant to N.C. Gen. Stat. § 75-16.

78. As explained in paragraphs 41 through 43, even if not directly liable for the misconduct, Salem Group is vicariously liable for Rosenblatt's misconduct.

## COUNT IV

**TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**
**(Against All Defendants)**

79. The allegations in Paragraphs 1–78 are re-alleged as if set forth fully herein.

80. Brocade has an economic relationship with innumerable customers and end-users, and receives revenues from those customers and end-users when they purchase Brocade products, including legitimate POD licenses and support contracts authorizing them to download the FOS.

81. On information and belief, Defendants are aware of the business relationship between Brocade and its customers and end-users, including the legitimate market for Brocade's POD licenses, license keys and FOS.

82. Defendants' unlawful acts, as set forth above, were designed to disrupt Brocade's relationship with these customers and end-users by maliciously inducing those customers and end-users to purchase counterfeit license keys and misappropriated FOS, instead of purchasing the legitimate products from Brocade and its authorized OEMs.

83. Defendants' unlawful acts, as set forth above, have disrupted Brocade's relationship with these customers and end-users. On information and belief, if it had not been for Defendants' unlawful acts, Brocade would have contracted with and sold to third parties legitimate license keys and FOS.

84. Brocade has suffered, and will continue to suffer, actual economic harm as a result of Defendants' unlawful acts, which have caused Brocade to lose at least $234,000 of revenue, based on the fair-market value of the counterfeit licenses and misappropriated FOS sold.

85. Defendants' wrongful conduct was neither justified nor privileged, and was not reasonably related to any legitimate business interest.

86. As a direct and proximate result of this conduct, Brocade has suffered damages that continue to accrue, in an amount to be determined at trial.

87. As explained in paragraphs 41 through 43, even if not directly liable for the misconduct, Salem Group is vicariously liable for Rosenblatt's misconduct.

**PRAYER FOR RELIEF**

WHEREFORE, by virtue of Defendants' unlawful conduct as alleged in Counts I through IV above, Brocade respectfully prays for a judgment:

1. In favor of Brocade and against Defendants on each of Brocade's claims;

2. Permanently enjoining Defendants from transacting any business relating to Brocade's switches, POD licenses, license keys or FOS;

3. Ordering that all counterfeits, or any means of generating counterfeit licenses or counterfeit license certificates, in the possession or under the control of Defendants be delivered to an officer of the Court or to Brocade;

4. Awarding direct and consequential damages to compensate Brocade for Defendants' breaches of their common law and statutory obligations and/or other unlawful conduct;

5. Awarding Brocade treble damages, attorneys' fees and costs pursuant to N.C. Gen. Stat. § 75-16;

6. Awarding Brocade attorneys' fees, costs and disbursements, with interest, pursuant to applicable law; and

7. Granting such other and further relief as the Court deems just and equitable.

Dated: May 14, 2021

By: */s/ John Morrow*
John Morrow (NC Bar No. 23382)
john.morrow@wbd.us.com
Womble Bond Dickinson (US) LLP
One West Fourth Street
Winston-Salem, NC 27101
Telephone: +1.336-721-3584

John D. Wooten IV, NCSB No. 51074
Womble Bond Dickinson (US) LLP
300 N. Greene St., Suite 1900
Greensboro, NC 27401
Telephone: 336.574.8090
Fax: 336.574.4524
JD.Wooten@wbd-us.com

Andrew M. Luger*
aluger@jonesday.com
Erin Sindberg Porter*
esindbergporter@jonesday.com
Andrew P. Leiendecker*
aleiendecker@jonesday.com
JONES DAY
90 South Seventh Street
Suite 4950
Minneapolis, MN 55402
Telephone: +1.612.217.8800
Facsimile: +1.844.345.3178

\* *pro hac vice* application forthcoming

*Attorneys for Plaintiffs Brocade Communications Systems LLC and Avago Technologies International Sales Pte. Limited*